IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 17, 2017 Session

## AMY JO SLOCUM v. JAMIE DON SLOCUM

**Appeal from the Circuit Court for Wilson County**
**No. 2015-DC-258     Clara Byrd, Judge**

---

**No. M2016-01881-COA-R3-CV**

---

This is a divorce case. Jamie Don Slocum appeals the trial court's division of the marital estate and the trial court's award of rehabilitative support to his spouse, Amy Jo Slocum. Husband argues that the trial court erred in finding that he dissipated marital assets (1) before the parties' separation and (2) during the pendency of the divorce. Husband also asserts that wife has an earning capacity higher than the $1,449 per month found by the trial court. Wife posits that the trial court's findings of fact are correct and supported by the preponderance of the evidence. She argues, however, that her spousal support award of $1,264 per month until May 31, 2025, should be classified as transitional support rather than rehabilitative. We hold that the trial court's judgment with respect to spousal support should be modified to reflect that her support award is in the nature of transitional spousal support. As modified, the trial court's judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J.,W.S., and BRANDON O. GIBSON, J., joined.

Derrick H. Green, Mt. Juliet, Tennessee, for the appellant, Jamie Don Slocum.

Misty Lavender Foy, Murfreesboro, Tennessee, for the appellee, Amy Jo Slocum.

# OPINION

## I.

The parties were married on October 17, 1998. Two daughters were born to their marriage, ages twelve and nine at the time of the divorce. The parties separated on May 20, 2015 after wife learned of husband's affair. She filed her complaint two days later. On June 5, 2015, wife filed a motion for support pendente lite. The trial court heard the motion on July 24, 2015. Both parties testified at the hearing but there is no transcript in the record. The trial court found "[t]hat Husband's testimony about his income, his tax returns, his trips to California, and his girlfriend, [is] not truthful." The court ordered husband to pay support pendente lite of $800 every two weeks, and also "to pay for any and all extracurricular activities, school supplies, registration fees, and any other school-related expenses for the children within two weeks of receiving notice from [wife]." Wife later filed two motions for contempt, on August 21, 2015, and May 4, 2016, alleging that husband had not paid support as ordered by the trial court.

On May 12, 2016, at the beginning of trial, the parties stipulated and agreed to a permanent parenting plan designating wife primary residential parent of the children and granting husband 114 days per year of residential parenting time. They further stipulated, for purposes of calculating child support, that husband's gross monthly income was $5,533, and that wife's was $1,449. Under the child support guidelines worksheet, this agreement resulted in a child support order requiring husband to pay $1,006 per month. The case was tried on the remaining issues of division of the marital estate and wife's request for spousal support and attorney's fees. At the end of the two-day trial at which the parties were the primary witnesses, the trial court found that husband "does, in fact, make, and his earning capacity is, $5,533 per month." The court found wife's earning capacity to be approximately $1,449 per month. Regarding wife's education, the court stated "that [w]ife is well educated and trained because she was a kindergarten teacher before she became a stay-at-home mom." Addressing husband's argument that it should have found wife to have a higher earning capacity, the trial court held as follows, in pertinent part:

> the [c]ourt does not find that [wife] is underemployed. Wife testified her reasons for working this job, and she is the primary residential parent and has to provide for the children the majority of the time, and thus, she is unable to work the hours or number of jobs necessary to make more than that at this time because of the two minor children who are living in the home. More specifically, in order for Wife to get recertified teaching, she would have to go back to school for

2

approximately two (2) years, Wife testified that this was not a viable option at this time. Instead, Wife testified that she has taken a job with American Airlines and has tried to set her hours around the time that she is primary residential parent. She further testified that, at American Airlines, there is room for advancement, she can pick up additional shifts, and she receives far greater benefits than she would if she went back to teaching, including, but not limited to, flights, and really good insurance.

\* \* \*

The [c]ourt finds that it would not be practical for Wife to get any other job or to go back to school because she's still responsible for the minor children. The [c]ourt further finds that Wife is earning just about as much as she could make outside the home with the time available.

The [c]ourt further finds that Husband is out of town a lot. Husband testified that he makes an average of twenty (20) to thirty (30) trips out of town per year, and the evidence is absolutely there. During his travels, Wife is solely responsible for the children.

(Numbering in original omitted.)

Regarding husband's dissipation of marital assets, the trial court found as follows:

The [c]ourt finds that Husband had an affair; Husband has not been truthful with the IRS; and that Husband has dissipated marital assets, as set forth more fully . . . below.

\* \* \*

The [c]ourt does make a finding that Husband did dissipate some of the marital property. The [c]ourt cannot account for all of the dissipation because there are a lot of deposits.

The undisputed proof shows that Husband cashed out his Star Retirement on April 20, 2015 in the amount of $20,204.00. The [c]ourt further finds that there was no reason to do so at

3

the time because there was in excess of $50,000.00 in the bank. The [c]ourt can only consider that this was done for the purpose of defeating the spouse's interest; there is no other credible reason for him to withdraw it except to defeat Wife's interest thereon. Husband's reasoning, which the [c]ourt did not find credible, was that the Wife had unknown credit card debt. However, Wife had attempted to pay the two credit cards, which together totaled approximately $10,000.00 from the bank account that had a balance in excess of $50,000.00, and Husband had the credit card companies refund the payments.

The [c]ourt finds that Husband's trips have gotten more and more expensive.

The [c]ourt finds that Husband did have a girlfriend, and there is no doubt that Husband had an affair. The [c]ourt finds that the testimony was that he admitted that he took his girlfriend on some trips with him at a time when he said his business was basically slow and he was not making money, yet he was going on these trips to make money in the future.

The primary marital asset was the parties' residence, which, at the time of the divorce, they owned encumbrance-free. The stipulated value of the house was $259,000. The parties reached a pre-trial agreement regarding the division of personal property, several relatively small bank accounts, wife's retirement account of $12,000 from her former teaching job, and a couple of credit card debts in the approximate amounts of $5,200 and $4,300. After making extensive findings of fact pertinent to each applicable statutory factor, the trial court held as follows in dividing the marital estate:

The [m]arital [h]ome is the children's residence. They have resided there since birth.

\* \* \*

The minor children need to maintain residence at the [m]arital [h]ome in order to maintain the stability of the family and friends that they have grown up with. The minor children need to live in the same school district. Wife has testified that she wants to stay in the house, and maintain the children's stability there.

4

Husband has not been honest and truthful with the IRS about his income.

The [c]ourt finds that it would not be fair to make the Wife pay to the Husband fifty-percent (50%) of the equity in the [m]arital [h]ome because then she would have an additional payment.

Considering the factors of equitable distribution above, the [c]ourt finds that in this particular situation the equities would require this [c]ourt to award Wife seventy-five percent (75%) interest, or $194,250.00, in the [m]arital [h]ome, and Husband twenty-five percent (25%) interest, or $64,750.00, in the [m]arital [h]ome. The [c]ourt's primary objective is to keep the children in their home until they are old enough to go to college, and also due to the Husband's dissipation of the marital assets during the time of this marriage. The remaining division of assets is relatively a wash, since each's vehicles have little to no value, the bank accounts have little to no value, and the credit cards are relatively equal.

At the beginning of trial, the parties stipulated that husband was in arrears on pendente lite support in the amount of $7,616. Husband, perhaps prompted by the trial court's admonition during trial that "you better write her a check before we leave this courthouse today, or else you're going to jail for direct contempt," did just that to get current on his support obligation, but remained in arrears for reimbursement to wife for the expenses of the children's extracurricular activities. Because husband had not timely met his support obligations, the trial court ruled that,

[p]er Tennessee Code Annotated 36-4-121,[1] the [c]ourt imposes a lien on Husband's share of the [m]arital [h]ome, as and for a security for the payment of child support and/or spousal support, to ensure future child support and spousal support payments, due to Husband's history not making payments in the pendente lite order.

---

[1]Tenn. Code Ann. § 36-4-121(e)(1) provides that "[t]he court may impose a lien upon the marital real property assigned to a party, or upon such party's separate real property, or both, as security for the payment of child support[,]" and section (e)(2) provides, "[t]he court may impose a lien upon the marital real property assigned to a party as security for the payment of spouse support or payment pursuant to property division."

The trial court awarded wife spousal support in the amount of $1,264 per month, which it classified as "rehabilitative alimony to allow her time to get on her feet." The court made this classification despite the parties' stipulation that wife was only requesting transitional and/or alimony in solido. Husband timely filed a notice of appeal.

## II.

Husband raises the following issues, as quoted from his brief:

> 1. Whether the [trial court] erred in finding Husband dissipated marital property.
>
> 2. Whether the [c]ourt erred in ordering [r]ehabilitative [a]limony [and] finding that it would not be practical for the Wife to get any other job or go back to school and that the Wife was earning as much as she could outside the home.
>
> 3. Whether the [c]ourt erred in its ruling regarding the marital property distribution between the Husband and Wife.

Wife raises the additional issue of whether the trial court erred in declining to award her attorney's fees.

## III.

### A.

This Court has set forth the standard of review of a trial court's division of marital property as follows:

> Once the marital property has been valued, the trial court is to divide the marital property in an equitable manner. Tenn. Code Ann. § 36–4–121(a)(1); *Miller* [*v. Miller*], 81 S.W.3d [771,] at 775 [(Tenn. Ct. App. 2001)]. A division of marital property in an equitable manner does not require that the property be divided equally. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002). Dividing a marital estate is not a mechanical process but, rather, is guided by considering the factors in Tenn. Code Ann. § 36–4–121(c). *Kinard* [*v. Kinard*], 986 S.W.2d [220,] at 230 [Tenn. Ct. App. 1998]. . . . Trial courts have wide latitude in fashioning an equitable

6

division of marital property, *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983), and this court accords great weight to the trial court's division of marital property. *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996). Thus, we defer to the trial court's division of the marital estate unless it is inconsistent with the factors at Tenn. Code Ann. § 36–4–121(c) or is not supported by a preponderance of the evidence. *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994).

*Luplow v. Luplow*, 450 S.W.3d 105, 109-110 (Tenn. Ct. App. 2014).

In making an equitable division of property, the trial court must consider the following statutory factors:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

7

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (Supp. 2016).

The trial court made specific findings of fact relative to each of the above pertinent statutory factors. The parties were married seventeen years, a duration which the trial court found to be a long-term marriage. Husband was 45 years old, and wife 44. Both were in generally good physical and mental health. Throughout the course of the marriage, husband was self-employed in the music industry as a producer, songwriter, and performer. His career required him to travel frequently; he regularly took between twenty and thirty trips away from home per year. Wife worked as a schoolteacher during the early years of the marriage. After the children were born, she became a stay-at-home mom, taking care of the children and the household.

The testimony of the parties differed sharply on certain financial matters. Wife testified that Husband earned a lot of money in cash during his music career travels. She said that husband "always told me that he made $100,000 per year. It didn't reflect on his taxes, but he made a lot of cash." Wife stated that they kept in upwards of $10,000 in cash in a closet in the house. When she realized she was going to file for divorce, she went to the closet to take a photograph of the cash, but found it gone. Husband admitted that he made cash earnings on the road, but said that it wasn't very much. He testified that he never made $100,000 in a year, nor did he tell wife he made that amount. He further denied that they kept cash in a closet.

In 2001, Wife's parents built a marital residence for the parties. The parties paid for the materials and took out a mortgage on the residence. They were able to pay it off

8

with the help of two inheritances, one received by husband from a family friend, and one from wife's uncle. Neither party had any separate assets at the time of the divorce.

Husband testified that he had "a relationship" with his paramour since 2013.[2] Wife testified that during the last part of the marriage, husband's out-of-town trips increased in frequency and duration. She put on extensive evidence documenting husband's travel expenditures. Husband admitted that his girlfriend accompanied him on some of these trips and that he traveled more often to Los Angeles, where she resided. He said the trips were primarily for his business, however. Husband also testified that he paid his girlfriend "directly" a couple of times for doing work on his music projects.

In mid-2014, Wife became suspicious that husband was having an affair. Husband denied it, and they attended marriage counseling the second half of 2014. In late March of 2015, wife discovered what she considered conclusive evidence of husband's ongoing affair and told him the marriage was over. In April of 2015, husband withdrew $27,000 from the parties' primary checking account and $19,000 from his retirement account. Wife began looking for employment; she said she "applied everywhere." She received an offer from Delta airlines to work as a flight attendant, which required her to travel to Atlanta for seven weeks of training. Wife testified:

> [Husband], at that time we were still living together, and I told him about that job opportunity, and he said that he would not watch the kids for those seven weeks, that he hoped my sister or my mom could watch them because he didn't have time.

Wife turned down the offer because she realized the job would require too much travel for her to be able to take care of the children. Wife's teaching certificate had expired in 2012. She testified that it would take her at least a year and a half of school and training to get it back. She felt that she couldn't afford to go that long without income and was not interested in returning to a teaching career. Wife got a part-time job with American Airlines working about 25 hours a week and earning an average of $1,449 per month. She testified that she picked up as many extra shifts as she could, and she was "trying to be a good employee to get full-time, to just move up the ladder, and to get full-time." She was optimistic that she would be able to advance with the company over time, and stated that American provided her with good employment benefits.

---

[2]Wife put into evidence numerous printouts of Facebook private messages between husband and his girlfriend that explicitly described their sexual activities. Husband did not deny that the messages were genuine, but testified that they were "just talk" and that their relationship was "purely platonic." It is obvious that the court did not believe him.

9

Husband testified that recent changes in the music industry had caused his business and earning capacity to decline. At the time of trial, he had been living rent-free at a friend's house. The trial court found that husband's earning capacity was $5,533, and wife's was $1,449 – the amounts stipulated by the parties for child support purposes. The evidence does not preponderate against this conclusion.

In 2011, the Tennessee legislature amended the pertinent statute to define "dissipation of assets" as "wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage[.]" Tenn. Code Ann. § 36-4-121(c)(5)(B). As this Court has observed,

> The statutory definition is consistent with prior Tennessee caselaw emphasizing that the "concept of dissipation is based on waste." *Williams v. Williams*, No. E2004–02439–COA–R3–CV, 2005 WL 2205913, at *9 (Tenn. Ct. App. Sept. 12, 2005) (citing *Altman v. Altman*, 181 S.W.3d 676, 681–82 (Tenn. Ct. App. 2005) (perm. app. denied)). This Court has noted that actions deemed to be dissipation have typically involved "intentional and purposeful conduct that has the effect of reducing the funds available for equitable distribution." *Long v. Long*, No. M2006–02526–COA–R3–CV, 2008 WL 2649645, at *9 (Tenn. Ct. App. July 3, 2008) (quoting *Williams*, 2005 WL 2205913, at *9). One factor to be considered in determining whether a spouse has dissipated marital property is whether the allegedly dissipating spouse "intended to hide, deplete, or divert a marital asset." *Long*, 2008 WL 2649645, at *9. [T]he party asserting dissipation . . . bears the burden of proof on this issue. *Altman*, 181 S.W.3d at 682.

*Hayes v. Hayes*, No. W2010-02015-COA-R3-CV, 2012 WL 4936282, at *8 (Tenn. Ct. App., filed Oct. 18, 2012). The issue of dissipation is often a "fact and credibility driven decision." *Watson v. Watson*, 309 S.W.3d 483, 492 (Tenn. Ct. App. 2009), quoting *Lane v. Lane*, No. M2000-01135-COA-R3-CV, 2001 WL 1523365, at *3 (Tenn. Ct. App., filed Nov. 30, 2001).

The trial court credited wife's testimony that husband's out-of-town trips had become more frequent and of longer duration since his affair began, and husband admitted that his paramour was with him on some of these trips. The court properly considered husband's dissipation of marital assets as one factor in the context of weighing the totality of the circumstances and equities of the divorce. As we have stated,

Dissipation is not a separate factor. To the contrary, the allegedly improper or wasteful expenditure or transaction must be considered in the context of the marriage as a whole, and it must be weighed along with all the other relevant factors in the case.

*Altman*, 181 S.W.3d at 682. The trial court also considered it important for the children to be able to remain in the same residence and school district, and recognized wife's role as their primary caregiver. We find that the trial court's division of the marital estate is consistent with the factors provided by Tenn. Code Ann. § 36-4-121(c) and is supported by the preponderance of the evidence.

## B.

Husband's challenge of the trial court's alimony ruling is also primarily supported by his arguments that wife had a greater earning capacity than that found by the court, and that he did not dissipate marital assets. Our standard of review of the trial court's spousal support decision is as stated by the Supreme Court:

For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award.

Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew*, 40 S.W.3d at 470; *Robertson v. Robertson*, 76 S.W.3d 337, 340–41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of

11

discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but " 'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.' " *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105–06 (Tenn. 2011) (internal citations and footnote omitted).

A trial court's award of spousal support is governed by Tenn. Code Ann. § 36–5–121(i) (2017), which provides:

In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further

education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36–4–121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

In its judgment, the trial court listed these factors and made specific findings of fact regarding each. Obviously, many of the facts recited in section III(A) above are also pertinent to the award of spousal support. The trial court ruled as follows:

Considering the findings set forth above, the Court finds that Wife is entitled to rehabilitative alimony to allow her time to get on her feet. More specifically, the Court finds that she needs extra time for the minor children to get older. The youngest minor child will not be eighteen (18) until 2025, and so the Court finds that a spousal support award from June 1, 2016 through May 31, 2025 is appropriate. Moreover, based on the combined gross monthly income less the child support consideration, an award of $1,264.00 per month to Wife would give Wife a total household income of $3,719.00 for a household of three (3) and Husband a total household income of $3,263.00 for a household of one (1).

Based on our review of the record, the evidence does not preponderate against the trial court's conclusion that wife has need, and husband has the ability to pay, spousal support in the amount of $1,264 per month.

At the beginning of trial, when the parties informed the court of their stipulations, among them was the agreement that wife was requesting transitional and/or in solido alimony. The trial court's divorce judgment states that "[t]he remaining issues to be decided [are] the fair and equitable division of marital property, . . . whether or not the Wife should receive spousal support, *either transitional or in solido or both,* and, whether or not the Husband should pay Wife's attorney fees." (Emphasis added). Wife asserts in her brief that "although the [t]rial [c]ourt classified and ordered the award of rehabilitative alimony, it is apparent from the [f]inal [d]ecree of [d]ivorce that the trial court intended to order a transitional alimony award."

The Supreme Court has recognized that "Tennessee statutes concerning spousal support reflect a legislative preference favoring rehabilitative or transitional alimony rather than alimony in futuro or in solido." *Mayfield v Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012). The spousal support statute provides, in pertinent part, the following classifications and characterizations of rehabilitative and transitional alimony:

(e)(1) Rehabilitative alimony is a separate class of spousal support . . . . To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other

14

spouse, considering the relevant statutory factors and the equities between the parties.

(2) An award of rehabilitative alimony shall remain in the court's control for the duration of such award, and may be increased, decreased, terminated, extended, or otherwise modified, upon a showing of a substantial and material change in circumstances. For rehabilitative alimony to be extended beyond the term initially established by the court, or to be increased in amount, or both, the recipient of the rehabilitative alimony shall have the burden of proving that all reasonable efforts at rehabilitation have been made and have been unsuccessful.

(3) Rehabilitative alimony shall terminate upon the death of the recipient. Rehabilitative alimony shall also terminate upon the death of the payor, unless otherwise specifically stated.

\* \* \*

(g)(1) Transitional alimony means a sum of money payable by one (1) party to, or on behalf of, the other party for a determinate period of time. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

(2) Transitional alimony shall be nonmodifiable unless:

(A) The parties otherwise agree in an agreement incorporated into the initial decree of divorce or legal separation, or order of protection;

(B) The court otherwise orders in the initial decree of divorce, legal separation or order of protection; or

(C) The alimony recipient lives with a third person . . . .

(3) Transitional alimony shall terminate upon the death of the recipient. Transitional alimony shall also terminate upon the death of the payor, unless otherwise specifically stated in the decree.

Tenn. Code Ann. § 36-5-121.

The trial court did not make specific findings regarding whether wife is in need of rehabilitation, or whether rehabilitation is feasible. It did find that "wife is well educated and trained," but that in order to get recertified as a teacher, "wife would have to go back to school for two years, which is not a viable option at this time." The trial court further found that "it would not be practical for wife to get any other job or to go back to school because she's still responsible for the minor children," and "wife is earning just about as much as she could make outside the home with the time available." The court stated it was awarding her spousal support "to allow her time to get on her feet." Furthermore, the award was for a determinate time, and the trial court stated that it would be "non-modifiable" – both characteristics of an award of transitional, not rehabilitative, alimony. We believe the trial court unintentionally referred to the spousal support award as rehabilitative support. In any event, we hold that the evidence preponderates in favor of an award of transitional support rather than rehabilitative support. Under the circumstances and considering the applicable statutory factors, we hold that an award of transitional alimony is appropriate in this case.

Wife argues that the trial court erred in refusing to order husband to pay her attorney's fees and asks for an award of fees on appeal. The trial court found that each party had sufficient resources to pay his or her own attorney's fees. The evidence does not preponderate against this decision. Exercising our discretion, we likewise hold that the parties will be responsible for their own attorney's fees on appeal.

## IV.

The judgment of the trial court is modified to reflect an award of transitional, rather than rehabilitative, alimony. The judgment is in all other respects affirmed. Costs on appeal are assessed to the appellant, Jamie Don Slocum. The case is remanded to the trial court for enforcement of the judgment as modified, and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE

16